**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:06-CR-0438** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **TREVINO E. ROGERS** | : | |

**MEMORANDUM**

Presently before the court are defendant's motions to suppress evidence (Docs. 23, 30) and motion to suppress identification (Doc. 25). The court held an evidentiary hearing on defendant's motions on April 9, 2007. (See Doc. 38.) The motions have been fully briefed and are ripe for disposition. For the reasons that follow, the motions will be denied.

I.    **Findings of Fact**[1]

On December 20, 2006, defendant, Trevino E. Rogers, was indicted by a grand jury. The indictment charges defendant with: (1) possessing cocaine base with the intent to distribute, and (2) retaliating against a witness and informant.[2] (Doc. 4.) The government alleges that, from January 1, 2006 until December 20, 2006, defendant knowingly and intentionally distributed and possessed with the intent to distribute five grams and more of cocaine base. (Id.) The government further alleges that, on November 28, 2006, defendant knowingly caused bodily

---

[1] These findings are based on testimonial and documentary evidence presented at the hearing on the motions. See United States v. Pelullo, 173 F.3d 131, 135-38 (3d Cir. 1999); see also Ornelas v. United States, 517 U.S. 690, 695-98 (1996).

[2] By order of court dated March 9, 2007 (Doc. 35), the court granted defendant's motion to sever these charges for purposes of trial.

injury to Christine Rupert ("Rupert") in retaliation for Rupert's decision to provide information about defendant's alleged drug offense to law enforcement officers. (Id.)  On December 21, 2006, defendant entered a plea of not guilty to each count in the indictment.  (Doc. 10.)

### A.    The Search and Seizure

The allegations in the indictment relating to possession of cocaine base are based upon evidence seized from defendant's person on September 22, 2006.  At approximately 7:40 p.m. on that date, Corporal Eric J. Norman ("Corporal Norman") of the Mifflin County Regional Police Department was working an aggressive patrol with the Mifflin County Drug Task Force.  (Tr. at 48-49.)  While patrolling a high crime area within the Lewistown borough, Corporal Norman observed two males who appeared to have "interacted" in an alley.  (Id. at 49-50.) Corporal Norman followed one of the individuals to a gas station parking lot, exited his unmarked patrol vehicle, and approached the individual.  (Id. at 50.)  Corporal Norman identified himself and advised that he was conducting an "aggressive interdiction patrol," which meant that he was looking for people breaking the law in high crime areas.  (Id. at 51, 62-63.)  When he approached defendant, Corporal Norman was not wearing a traditional police uniform, but was wearing a vest that identified him as a police officer and carrying a holstered gun.  (Id. at 50-51, 61.)

Corporal Norman asked the individual for his identification.  The individual was fully cooperative and identified himself as Trevino Rogers.  (Id. at 52.)  After defendant had been identified, Corporal Norman asked him if he had any weapons

on his person, and defendant responded that he did not.  (<u>Id.</u> at 51.)  Corporal

Norman then asked if he could search for weapons, and defendant stated that he

could.  (<u>Id.</u> at 51, 53.)  Corporal Norman testified that he did not possess a

reasonable suspicion that defendant had committed a crime at this point.  (<u>Id.</u> at

54.)  Corporal Norman also testified that he would not have pursued defendant any

further had defendant refused to identify himself or refused to consent to the

search.  (<u>Id.</u> at 56, 64.)  Corporal Norman did not use any force against defendant,

did not draw his gun, and did not shout at defendant.  (<u>Id.</u> at 53.)

While conducting the search, Corporal Norman felt a hard rocky bulge in

defendant's right front jeans pocket.  (<u>Id.</u> at 52, 65.)  Defendant pushed Corporal

Norman's hand away from the bulge, told Corporal Norman not to touch "his

money," turned, and ran.  (<u>Id.</u> at 53.)  Corporal Norman and another officer pursued

and apprehended defendant.  (<u>Id.</u> at 53-54.)  In the search incident to defendant's

arrest, the police recovered cocaine base from defendant's right front jeans pocket.

(Doc. 23 ¶ 17; Doc. 48 at 3.)  Defendant now argues that the cocaine base should be

suppressed because Corporal Norman had no legal basis for stopping, searching, or

arresting him.  (<u>See</u> Doc. 23 ¶¶ 14, 16.)[3]

---

[3] Two days after defendant's arrest, the police executed a search warrant at
defendant's place of residence.  (Doc. 30 ¶ 17; Doc. 31 at 2; Doc. 56, Ex. 1.)
Defendant also claims that all evidence that resulted from this search must be
suppressed because it was the fruit of an illegal arrest.  (Doc. 31 at 2.)

**B.    The Identification**

The indictment's allegations of retaliating against a witness are based upon
Rupert's identification of defendant as her attacker.  Rupert was a witness who had
been cooperating with authorities in the investigation of Benjamin Simmons
("Simmons"), an individual who was suspected of narcotics trafficking.  (Tr. at 8,
24.)  On December 1, 2006, Rupert informed Detective Barry Howe ("Detective
Howe") that she had been kidnapped and assaulted three days earlier.  (Id. at 24-
25.)  Rupert told Detective Howe that her attacker had repeatedly referred to her as
"a little girl who could not keep her mouth shut" and that she suspected that
Simmons was behind the attack.  (Id. at 27.)  She described her attacker as a thirty-
year-old black male, who was 5'11", weighed 170 pounds, had a shaved head and
goatee, and was wearing a black hooded sweatshirt, baggy jeans, and black
sneakers.  (Id.)  Detective Howe promised Rupert that he would assist in identifying
her attacker by preparing a photographic array containing Simmons' known
associates.  (Id. at 26.)

Detective Howe asked Pennsylvania State Trooper Richard Leight ("Trooper
Leight") to prepare the array.  (Id. at 5, 26.)  Detective Howe informed Trooper
Leight that the suspect was a black male with a shaved head and requested that
Trooper Leight incorporate some known associates of Simmons, including
defendant, into the array.  (Id. at 6, 9, 26, 38.)  As per Detective Howe's request,
Trooper Leight included photographs of defendant and four known associates of
Simmons.  (Id. at 8-9.)  To complete the array, Trooper Leight selected photographs

4

from the Mifflin County Prison database that matched the description provided by Detective Howe. (Id.)

The completed array contained a total of sixteen photographs on two pages, one labeled A and the other labeled B. (Id. at 7.) Defendant's photograph was designated as A2. Detective Howe presented the array to Rupert, told her that it contained known associates of Simmons, and asked her to pick out anyone she recognized as her attacker. (Id. at 29-30.) According to Detective Howe, Rupert stared at the photographs for a few minutes, picked up page A, and began crying. (Id. at 31-33.) She then placed page A underneath page B, pushed both pages to the side of the table, and said, "I don't think he's here." (Id. at 31-32.)

Sensing Rupert's reluctance, Detective Howe advised Rupert of the importance that she identify her attacker's photograph if it was contained in the array. Detective Howe explained that if she did not make an identification, he would be required to complete a report indicating that she had viewed the array and concluded that it did not contain her attacker's photograph. (Id. at 32, 42.) Rupert then asked Detective Howe if he could escort her mother from the room, and Detective Howe complied. (Id. at 33-34.) When Detective Howe returned, which was approximately ten minutes after Rupert had been provided with the array, Rupert identified defendant as her attacker. (Id. at 30-31, 34.) Detective Howe asked if she was certain, and she confirmed that she was. (Id. at 34.) Rupert explained that she had not identified defendant earlier because she feared that her family might retaliate against him. (Id.)

5

Defendant now contends that the identification should be suppressed because the photographic array contained photographs of individuals who were "dissimilar in appearance to Defendant" and because Rupert knew some of the individuals included in the array. (Doc. 25 ¶ 9-10.) Specifically, Rupert knew the individuals pictured in photographs A4 and A7. (Tr. at 19-20.) In addition, the men in photographs A8, B1, and B6 differed in weight from defendant, and those in photographs A1, A3, A4, A8, B2, and B3 had different haircuts and/or facial hair than defendant. (Id. at 13, 18, 44-45.) Finally, the men in photographs A1, A3, A6, and A8 were wearing "street clothes," while defendant was wearing an orange jumpsuit. (Id. at 8, 15, 46.)

## II.   <u>Discussion</u>

In the instant case, defendant asks the court to suppress the drug evidence found on his person on September 22, 2006, all evidence found pursuant to the search warrant executed on September 25, 2006, and the identification made by Rupert on December 1, 2006. The court will address defendant's requests *seriatim*.

### A.   <u>Motion to Suppress Evidence</u>

Defendant contends that his initial confrontation with Corporal Norman, the subsequent search of his person, and his eventual arrest all violated the Fourth Amendment prohibition against "unreasonable searches and seizures." The court turns first to the issue of defendant's alleged seizure. Whether a police encounter rises to the level of a seizure, requiring police to have at least "reasonable suspicion" of illegal activity, hinges on whether a reasonable person, exposed to the

same surrounding circumstances, would feel free to terminate the encounter.
United States v. Drayton, 536 U.S. 194, 202 (2002).  "Even when law enforcement
officers have no basis for suspecting a particular individual, they may pose
questions, ask for identification, and request consent to search luggage—provided
they do not induce cooperation through coercive means." Id.  Coercion, sufficient
to transform an encounter into a seizure, generally requires that police act in a
threatening or dominating manner, by brandishing a firearm or making a "show of
force." Id.  That an officer wears a uniform and a holstered sidearm does not,
without more, create intimidation sufficient to overcome the resolve of a
"reasonable person." Id.

In the instant case, Corporal Norman admitted that he did not possess the
reasonable suspicion necessary to seize defendant.  (Tr. at 54.)  However, this fact
alone does not make Corporal Norman's actions unconstitutional.  Corporal
Norman's actions would constitute an unlawful seizure only if a reasonable person
in defendant's position would not have felt free to leave.  See Drayton, 536 U.S. at
202.  The court finds no evidence of the types of coercive actions that would be
required to transform Corporal Norman's encounter with defendant into an
unlawful seizure.  Corporal Norman approached defendant, identified himself as a
police officer, and explained his purpose in stopping defendant.  (Tr. at 51, 62-63.)
Corporal Norman asked only routine questions, such as defendant's identity and
whether he was carrying any weapons.  (Id. at 51-52.)  Corporal Norman did not use
any force against defendant, did not draw his gun, and spoke to defendant in a

7

conversational tone. (Id. at 52-53.)  That Corporal Norman was wearing a police vest and carrying a holstered gun are not sufficient to constitute coercive action. See Drayton, 536 U.S. at 202.  Accordingly, the court finds that Corporal Norman's interaction with defendant was a mere encounter for which no degree of suspicion of illegal activity was required.

The court turns next to the issue of the search of defendant's person.  Police officers are permitted to conduct a search if they obtain consent from the individual in control of the area to be searched.  See id. at 200-01.  Consent, to be effective, must be given voluntarily and during the course of a legal encounter.  Id.  Having found that Corporal Norman's encounter with defendant was a legal one, the sole question becomes whether defendant voluntarily consented to be searched.  Id.; United States v. Griggs, 114 F. Supp. 2d 334, 338 (M.D. Pa. 2000).  Corporal Norman testified that he asked defendant for permission to search his person for weapons and that defendant consented.  (Tr. at 51, 53.)  While defendant's motion suggests that he "did not agree to be searched," defendant did not proffer any testimony to that effect during the April 9 evidentiary hearing.  (See Doc. 23 ¶ 10; see also Tr.) Finding Corporal Norman's testimony to be reliable and uncontroverted, the court concludes that defendant voluntarily consented to be searched.

The court turns finally to defendant's arrest.  A warrantless arrest of an individual in a public place for a felony is consistent with the Fourth Amendment if the arrest is supported by probable cause.  Maryland v. Pringle, 540 U.S. 366, 370 (2003).  To determine whether an officer had probable cause to arrest, the court

8

must consider the events leading up to the arrest and determine whether "these facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Id. at 371.  Probable cause exists if the officer, with his or her experience and based on the facts then known, could reasonably conclude that a crime has been committed.  See Illinois v. Gates, 462 U.S. 213, 230-31 (1983) (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949)); see also Franks v. Delaware, 438 U.S. 154, 171 (1978).  After examining the facts of the instant case, the court finds that defendant's arrest was predicated upon probable cause.  During the course of a lawful consent search, Corporal Norman felt a hard rocky bulge in defendant's right front jeans pocket that was consistent with an illegal substance. (Tr. at 52, 65.)  Defendant immediately pushed Corporal Norman's hand away and claimed that the bulge was money — a claim inconsistent with Corporal Norman's observations.  (Id. at 52-53, 65.)  Defendant then fled the scene.  (Id. at 53.)  The court finds that this evidence was more than sufficient to lead Corporal Norman to a reasonable belief that a crime had been committed.  Consequently, Corporal Norman was constitutionally permitted to arrest defendant and to conduct a search incident this lawful arrest, which search revealed that defendant was in possession of cocaine base.

For the foregoing reasons, the court will deny defendant's motion to suppress the evidence seized incident to his arrest.[4]

### B.   Motion to Suppress Identification

A challenge to the legitimacy of a pretrial identification procedure implicates the Due Process Clause.  See United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003); Burkett v. Fulcomer, 951 F.2d 1431, 1448 (3d Cir. 1991).  To demonstrate a violation of due process, a defendant must establish:  (1) that the procedure used was "unreasonably" or "impermissibly suggestive," and (2) that this suggestiveness gave rise to a "substantial likelihood of misidentification."  United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995); Burkett, 951 F.2d at 1448; United States v. Dowling, 855 F.2d 114, 117 (3d Cir. 1988); see also Lawrence, 349 F.3d at 115. When the procedure involves a photographic array, the court should consider factors such as the size of the array, the manner of the array's presentation by police, and the details of the photographs themselves.  See Reese v. Fulcomer, 946 F.2d 247, 260 (3d Cir. 1991).

Turning first to the issue of size of the array, the court notes that an array with as few as six pictures is not *per se* unconstitutional.  United States v. Stevey, No. 05-232, 2006 WL 2038614, at *4 (W.D. Pa. July 20, 2006) (citing United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994)).  "The larger the number of pictures

---

[4]  Having concluded that Corporal Norman's initial encounter with defendant and defendant's subsequent arrest were lawful, the court will also deny defendant's motion to suppress the evidence seized from his residence pursuant to a search warrant.  See supra note 3.

used in an array, the less likely it is that a minor difference . . . will have a prejudicial effect on selection." <u>Sanchez</u>, 24 F.3d at 1262.  In this case, the array contained sixteen photographs.  (Tr. at 7.)  Even removing the photographs of the two individuals that Rupert knew personally leaves fourteen photographs.  (<u>See</u> <u>id.</u> at 19-20.)  Because this number is more than double constitutional standards, the court finds that this factor weighs in favor of the array's validity.

Likewise, the court finds no evidence of prejudice in the array's manner of presentation.  Detective Howe neither emphasized a particular photograph nor suggested to Rupert whom she should identify.  He simply provided Rupert with the two-page photographic array and permitted her to examine it to see if it contained a photograph of her attacker.  (<u>Id.</u> at 29-30.)  Detective Howe's suggestion that the array contained known associates of Simmons was not improper because he testified that he intended this statement to refer to *all* sixteen photographs in the array.  (<u>Id.</u> at 47.)  Accordingly, the court finds that this factor also weighs in favor of the array's validity.

Where, as here, there is no prejudice in the manner of an array's presentation, "the primary question is whether the suspect's picture is so different from the others that it suggests culpability."  <u>Reese</u>, 946 F.2d at 260.  There is no constitutional requirement that all photographs contained in an array "be uniform with respect to a given characteristic."  <u>Stevey</u>, 2006 WL 2038614, at *4 (citing <u>Jarrett v. Headley</u>, 802 F.2d 34, 41 (2d Cir. 1986)).  Even where the defendant's photograph possesses a characteristic that is not present in any other photograph,

11

the array may be constitutional.  For example, in <u>Reese v. Fulcomer</u>, the Third

Circuit held that an array was not impermissibly suggestive despite the fact that the

defendant was the only individual with "long sideburns and a card revealing his

name and height."  946 F.2d at 260.  Unlike the defendant in <u>Reese</u>, defendant does

not argue that he possesses a unique characteristic that is not exhibited by *any* of

the other fifteen individuals included in the array.  <u>See</u> <u>id.</u>  Defendant merely

argues that *some* of the individuals photographed differ from him in terms of four

characteristics, namely, weight, hairstyle, facial hair, and clothing.  <u>See</u> <u>supra</u> Part

II.B.

The court is unpersuaded by defendant's argument that the aforementioned

differences make the photographic array unduly suggestive.  Viewing the array as a

whole, the court finds that defendant's photograph is not "so different from the

others that it suggests culpability."  <u>See</u> <u>Reese</u>, 946 F.2d at 260.  In fact, defendant's

photograph is substantially similar to the vast majority of the photographs included

in the array.  After a careful examination of the array, the court finds that only four

of the individuals photographed exhibit materially different characteristics than

defendant.  Specifically, the individuals pictured in photographs B2 and B3 have

markedly longer hair than defendant, and the individuals pictured in photographs

A8 and B1 are substantially heavier than defendant.  The court finds all other

aberrations amongst the photographs to be immaterial.  Any differences in clothing

are inconsequential because none of the individuals photographed are wearing

clothing matching Rupert's description of the suspect.  <u>See</u> <u>Harker v. Maryland</u>, 800

F.2d 437, 444 (4th Cir. 1986) (stating that similarity of clothing to witness's

description of suspect was key question when determining validity of a pre-trial

identification procedure).   In addition, any differences in facial hair are minor at

best.  To allow such minor differences to vitiate an otherwise valid pretrial

identification procedure would place an undue burden on law enforcement officers

"to search for identical twins in age, height, weight, or facial features" when

administering such procedures.  United States v. Traeger, 289 F.3d 461, 474 (7th Cir.

2002).

Furthermore, even if the court were to accept defendant's arguments and

remove from consideration those individuals whose photographs differ from

defendant's in any respect, six photographs would remain.[5]  There is no dispute

that these six photographs are similar in all material respects.  All six individuals

are black males of approximately the same age, height, and weight.  All are wearing

orange shirts, have closely-shaven heads, and have little to no facial hair.  In

addition, all six individuals are pictured in front of the same background, which

appears to be a white block wall.  The marked similarities amongst these six

photographs weighs heavily in favor of the array's propriety.

Finding the photographs to be sufficiently similar to meet constitutional

mandates, the court concludes that the array was not unduly suggestive.

Accordingly, the court will deny defendant's motion to suppress the identification.

_____

[5]  These photographs are A2 (defendant's photograph), A5, B4, B5, B7, and
B8.

## III.   <u>Conclusion</u>

For the foregoing reasons, defendant's motions to suppress evidence

(Docs. 23, 30) and motion to suppress identification (Doc. 25) will be denied.  An

appropriate order will issue.


   S/ Christopher C. Conner   
CHRISTOPHER C. CONNER
United States District Judge


Dated:      June 21, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:06-CR-0438** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **TREVINO E. ROGERS** | : | |

## <u>ORDER</u>

AND NOW, this 21st day of June, 2007, upon consideration of defendant's

motions to suppress evidence (Docs. 23, 30) and motion to suppress identification

(Doc. 25), and for the reasons set forth in the accompanying memorandum, it is

hereby ORDERED that the motions (Docs. 23, 25, 30) are DENIED.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge